Please rise. Illinois Telecorp is now in session with Honorable Martha S. McFarland. Good morning, everyone. Please be seated. All right. We'll call the first case. If both attorneys that are going to present an argument would step up and identify yourselves for the record, that would be appreciated. Jessica Fortier for the appellant. Michelle from all these sides. How do you pronounce your last name? Fortier. Fortier. Good morning to both of you. Each side will have approximately 15 minutes to present oral argument. And from that, Fortier, you may save some time for rebuttal. I would like the parties to specifically address, the panel would like you to specifically address the sentencing issue. So keep that in mind as opposed to not addressing it at all. We would like you to cover everything that you feel is very important. But in particular, we would like to hear a comment on that. So with that, Fortier, you may approach again and proceed with your argument. We'll proceed to court. My name is Jessica Fortier. I represent the appellant in this case, Antonio House. I would like to reserve a few minutes for rebuttal. Your Honor, this case is about police coercion. In the Burge cases, there were copious amounts of allegations against him, and they were dismissed over 20 years span. It wasn't until the full weight of the allegations were looked at together that police torture was finally recognized. In this case, to support a consistent claim by Antonio that his confession was coarse, he has now presented newly discovered evidence of prior allegations of abuse by Officer Cato and the other officers. Instead of being dismissed at the Burge cases, we request that he receives an evidentiary hearing where all of the prior allegations against Cato could be considered in addition to his confession. How was this confession forced? Excuse me, Your Honor? How was this confession forced? First, he was held for 36 hours. And keep in mind, Cato was only 19 years old at the time. He had a very limited criminal past, only very minor possession cases. He was told that he would be able to have a remand fee if he testified against the other co-defendants. They knew he wasn't the shooter and they just wanted his testimony. He was threatened his safety and that of his family. He alleges that Willie Lloyd, the opposing leader of the unarmed by force, was brought into the room with him and threatened the safety of his family if he didn't testify. Our newly discovered evidence of the affidavit of Casey Dunbar shows that Willie Lloyd was present at the police station at the same time that Antonio House was there. Now, it may not prove that Willie Lloyd was brought in. I mean, is it inappropriate to bring in a gang member into a room while somebody is being interviewed? To threaten their safety and get him to admit, falsely admit that he was involved in this crime. Well, how did they get him to falsely admit that? He was afraid for his own safety and for his family's safety. That the opposing gang members would kill his family or himself if he didn't do what Cato and the other officers wanted him to do, which was dependably. What did Officer Cato specifically do here? Because I think it's in the motion, the question or the surprise, there's indication that Perez struck the defendant. What did Cato do here? He promised an amnesty. He told him that he knew he wasn't the shooter, but he promised him that he would be able to go home if he did pinpoint the other offenders as the shooters and the kidnappers. And then he threatened his safety and said, I can't protect you from the gang members unless you go along with the concession. And then that's also when Perez hit him in the head. That's when he claimed that Officer Cronin, Detective Cronin, brought in Willie Lloyd at that time to, again, threaten his safety of himself and his family members. Are you contending that this is a physical coercing case? Because the claim that Detective Perez struck him in the head, he never testified to that, the defendant. He never said anybody struck him. When he testified at trial, he did say that he actually put himself at the scene. Forgetting his statement, he said that he went to the scene because he knew as a gang member that if he didn't, he would receive some kind of punishment. But he never said that anybody ever hit him in the head, ever. And he also said, he did say that the detective brought in Willie Lloyd. Correct. So, are you suggesting that this is not a physical coercion case? No, no. Let's try to bring the focus back, then, to the psychological coercion. Right. The positive leniency, the false positive leniency, and the threat of his safety and his family's safety is the method of coercion that we are arguing is why he falsely confessed. Well, actually, now let me, if I could. Sure. All right. So, we've previously reviewed. This court has actually looked at and considered 50 complaints that were filed. And from those 50, 18 of them, I believe, was, did not name Cato. Correct. So they were removed from our review. Correct. There were 32 others that were actually analyzed and reviewed by this court in camera. And we concluded that there wasn't a single case where Cato was named where there was an allegation of a false promise of leniency. None. We also concluded that there was not a single case where a witness was brought into the room to be used against a defendant. There was one case where we said Cato was, it was alleged in a complaint that he threatened a witness in a triple homicide. Now, you're kind of suggesting in your briefs that we should do a redo when we already did this. And you've suggested that we should turn over the case that I've just described, which I'm describing again. So, there isn't a pattern in the 50 complaints that we reviewed regarding false promises of leniency. There weren't any promises of leniency in those cases. Now, why should we redo what we did in 2007? My argument is that the 50 files should be reviewed. Mainly because those 18 files, as Joanna pointed out, were never reviewed. No, we did review them. We said, though, that Cato was not named because that was the subject of this whole complaint, is that Cato was the one that brought the witness in. He was in the room with him alone. And that there were promises of leniency. Those complaints, there aren't any promises of leniency. So, I would disagree with you on that. Antonio from day one had alleged corrosion by all four. Officer, criminal chamber, and Cato. Well, then let's go to that. In front of Judge Wattis, the lawyers stood there and agreed that the subject of the review was Detective Cato. Now you're asking us to ignore that record, which is documented in the previous decisions, and say that was a mistake for something when the lawyer for Mr. House agreed that he was looking at what Detective Cato had done. Right. And I would argue that that attorney did not agree. He just merely did not object. Also, as your Honor's aware, we raised an effectiveness of that counsel for not calling attention to Wattis, but the other three officers needed to be, the OPS records needed to be reviewed as those other three officers. And again, on appeal of that denial, as you point out, there was no mention of not reviewing for the other three officers. And that's also an ineffectiveness on his part. How do we review them when they're not here? Antonio should not be punished for his files not being here. It's not his fault. How do we review them with them not being here? What are we supposed to do? Reorder the OPS records? And assuming that they weren't the originals that were sent to the court to review, I would think it would be too hard of an imposition, too much of an imposition, to recreate those 50 files for the court to review again, especially in light of what we're looking at, coercion of a confession for a natural life sentence? Well, I don't know how you can ask us to reorder something. You're the appellant. You have the burden. You could have asked for a stay of these proceedings. You could have asked that your extensions be granted because you couldn't compile the appropriate records. I don't know where those OPS records are, but I do know that we have previously reviewed all of them. And I don't think it's appropriate for you to ask us to compile a record now, to review something that we did. We did do this. I mean, we looked at these files before. But not to the other three officers. And there were no complaints of false promises that I'm aware of. It is true, but not as far as the other three officers. And now that we have rediscovered evidence that there have been allegations of promises of leniency and false confessions because of – But where is it? We don't have that evidence. You're saying we do. There are cases. There are published cases. And although there are allegations and not substantiated, that should not – we should not dismiss those. It goes through a pattern of detective Cato of falsely – of giving defendants to falsely consent. In the Birch cases, people be partisan. They did take the allegations and not substantiated claims to impeach the credibility of the officer and find that the defendant did have approvalist confession. And we amended and suppressed that confession in the pre-trial. All right. Well, you're saying this is newly discovered evidence. Correct. All right. How is this newly discovered evidence? Can you explain how this is newly discovered evidence, and you or your client was not able to obtain this information beforehand? The cases we cited as newly discovered were after the defendant was convicted. They were in 1998 and 2001, McDaniel and Wallace. Additionally, the affidavit by PC Dunbar was not received until 2010. So those we would describe it as far as timeline is after his conviction. But wouldn't he know that ours is Dunbar? I'm sorry? Wouldn't the defendant know he was in the lineup? Correct. But he wouldn't know that he was willing to testify that Lily Wood was there. I mean, we're talking about gang members. It's hard to believe that one gang member is going to testify against another. This affidavit now states that PC Dunbar would testify that Lily Wood was there at that station at the same time. Now, there's some suggestion in the record that the lineup that allegedly took place, involving another case where Lily Wood witnessed it, occurred on October 27th. But the statement that he apparently gave was on October 28th, later the next day. So how do we... Our client's statement? I'm sorry to clarify. Yes, yes, yes. So there's a day difference. So how does that show that Lily Wood was there the next day? Wait, wait, wait. PC Dunbar arregested on the 27th. Right. Okay. Right. So our defendant, Antonio, gives the false confession the 28th. But because he didn't admit to it immediately after Lily Wood left the room, does not eliminate the fact that his confession was forced. It was a continual 36 hours of the police officers coming in and out, threatening to injure him and his family. I didn't realize by the record what you're saying now. The testimony at the trial was that he confessed after they brought Lily Lloyd in. Not that he waited 36 hours. He said he confessed after they brought Lloyd in and placed the spear in his mouth. It was 36 hours later. Well, the 28th is after Lily Wood. I believe Lily Wood didn't say immediately when Lily Wood left. I admitted to it. We don't have the record again of the trial, do we, this time? That's the other thing that's missing, right? The trial transcript. The trial transcript? No, I was going to say you did supply a court this time with the entire record of the initial trial and motion to suppress hearing. Yes. Okay. I misspoke. The case of Dunbar is not an interrogation, right? Correct? Correct. All right. So how does this affidavit support your claim that the confession was involuntary? He wasn't there, and, in fact, he says that this incident that he's referring to takes place the day before, as was just previously stated. So how does Casey's affidavit support your allegation that the confession was involuntary? It runs credence to defendant's claim all along that Lily Lloyd was at the police station and brought into his room. And really, it doesn't prove that Lily Lloyd was actually there. But you don't say that Lloyd was taken into interrogation. Correct. I agree with that, and I'm not arguing that. What we're arguing is that it's newly discovered evidence that Lily Lloyd was at least in the police station at the same time as Antonio House. We're not saying that it proves he was brought into that room, but what it does run support to is Antonio's claim all along that Lily Lloyd was brought in. The evidence, newly discovered evidence of allegations against Cato also runs credence to the defendant's claim all along that his confession was coerced. And going to Lily Lloyd, I believe the record indicates that he was represented by counsel and counsel was present at the station? Yes. Okay. So why would Lily Lloyd, with his attorney present, or why would his attorney allow him to work with the police detectives? That's a great question, Your Honor, but that would be a question for a third-stage evidentiary hearing. Didn't the trial judge, though, he's already rejected that. He says he couldn't possibly ever believe that Lily Lloyd's lawyer would ever let Lily Lloyd cooperate with the police. But Lily Lloyd and this other baby Tye were the two big gang leaders that apparently had a parting of ways over this particular area where they were selling drugs. Right. So the credibility of the allegations should not be considered at second stage. That's why we're asking for a third-stage evidentiary hearing. Additionally, the court for a long time found it just impossible to believe that Burge would commit torture against a woman. And I agree with you that there are cases where it was ignored. Now, in this particular instance, though, if you could try to explain to me, and this is another thing I don't particularly think is a good notion, but police officers, when they interrogate, are allowed to go in and lie to people to get confessions. Now, whether that's good or bad, I don't know that the law has changed in this regard, but let's use, for example, where a detective goes in and says, so-and-so, you know, flipped on you. Or we have a witness out there that identifies you in the lineup. There's cases that say the police can actually fabricate, but that doesn't mean that the confession is involuntary. Am I wrong on that one? No, you're correct. How is this? Okay, so here's the second part of my question. Sure. How is this different if police can say to somebody, well, we've got fingerprints, we've got DNA, we've got this witness, and then the person confesses? How is this case different when they say, hey, if you tell us what we want to hear, we're going to let you go home tonight. Okay? And you say, well, he's not very sophisticated. You know, all he has are drug convictions. But when police tell somebody, you know, tell us you murdered someone and we're going to let you go home, I mean, would that be the kind of thing that – how is that different from these other cases? The court found that when the police officers threat of harm and promises of specific leniency overcome the role of a defendant to not falsely confess, that is an error and that is a police misconduct. In this case, Kato and the other officers are promising that he could be a witness against the other drug dealers, be let go, not be charged for it, and threatening him that their gang members were going to hurt him and his family if he didn't confess. All of that put together, as your Honor said too, the limited career path from his young age. When you look at that in the totality of the circumstances, it does, we argue, it does show that his will was overborne by these officers to falsely confess. Right. But in this case, there was a, you know, a full-blown hearing on this whole idea once before. Right. And we've already reviewed these complaints regarding Kato, none of which disclosed any promises of leniency. So aren't we sort of, I mean, you're asking us to go back, again, I'm sort of going back to the beginning, but you're asking us to look at these complaints that we've already reviewed in camera that did not show promises of leniency, false promises of leniency. Right. The reason why we are asking that. And the two cases you cited actually did not involve, they were never decided on the notion of a false promise of leniency. Those allegations were made by those defendants. Right. The court has fully reviewed those cases, and there was never any suggestion that those cases hinged on false promises of leniency. So the allegations were made, and that's what we are denying. The mere fact that they were made should have been brought in to impeach Kato and the other officers in their credibility. The evidence here was so weak that if the police officer's credibility was impeached and lessened their credibility, then Antonio's claim all along that his confession was coerced would have no credence with the jury. Let's get to the bottom line here. What evidence do you have that the defendant here was not present as a lookout for the murders? There is no evidence that he was present for the murders except for his false confession. The identification of him at the scene of the kidnapping is from Eunice Clark and her boyfriend, but that demonstrates him at the scene of the murders. Didn't he himself take out his statement? He testified at trial. He put himself there. He said that he had to go with, which one? Which one of the guys? Witherspoon. Witherspoon. He said he had to go, and he knew that if he didn't, he would be killed or sanctioned or whatever they do, so he actually put himself there. He said he drove up there, and then there were some shots. He heard some noises, and then he drove away. So he put himself at the scene. Actually, I disagree with you on that. He did testify that he had to drive the gang members who were higher up than him over to the railroad tracks. Those two of the actual shooting occurred up above where he dropped them off around by the railroad tracks. The defendant admitted that he drove them there, dropped them off, and immediately turned around and left. So does the jury have concluded that, forgetting everything else, he's put himself there? Was there ever a defense of coercion, that he was coerced to drive there? The fact that the higher-ups in the gang told him to. Did the jury ever get instructed on that? Did the defendant raise the issue that he was actually forced to do this? Couldn't they have taken his words to be exactly maybe more than what they were, that he was admitting only what he needed to admit? Except for the fact that the other evidence in the case is so weak against him. He has led a long and professional life, of course, and we would bring that up. It's so weak. There were two eyewitnesses that put him at the scene. Very incredible eyewitnesses who admit to taking over $3,000. Actually, you know, they're the kind of witnesses you would expect. Wasn't everybody involved in this a gang member? Weren't they all selling drugs, and weren't they all gang members? I mean, those are the kind of witnesses you're going to get. So, don't the juries kind of get that? The jury didn't hear that Eunice now has a key witness at her testimony. And when Eunice put Antonio at the scene of the kidnapping, it was only after she was interviewed by Cato. Her initial statement to police was only Fred and Ted were involved. Well, how do you know that? I thought she immediately told one of the victim's girlfriends, Beyonce, that he had been killed that day. He was taken by Fred and Ted. And the remaining number of people that were involved? Fred and Ted. No. How did they get the other guy who took him to the body? Fred and Ted took him. Which one? Oh, I'm sorry. When she first went to police, when she first talked to the girlfriend, she never said Antonio was there. How do you know that? Because she was cross-examined at trial by defense counsel, and she admitted that when she first went to police, she did not involve Antonio. It wasn't until a few days later when she was interviewed by Cato, but then she placed Antonio along with maybe six or seven other defendants. Don't they all kind of operate under a cloud of fear, naming people? I mean, you know, it's all over the record what happens. Antonio House himself said that if he didn't drive to where he was going, he would be fined. Isn't that really the culture? Couldn't the jury easily believe that she was delivering information as she became more comfortable in her surroundings? I mean, isn't that really how it works? They try to say as little as possible because every minute their life is in jeopardy. For example, the record also shows that that other guy, whose nickname is Smurf, had to speak in almost a whisper and said, I'm not coming to court because if I do, they're going to kill me. So this is the whole kind of picture under which these people are operating. You say she's terribly incredible when, in fact, a jury could easily conclude that she's extremely credible because they're all operating under this dictatorship of these gangs, where the guy at the top is directing everything down. So you say she's terribly incredible, but actually it could be concluded that she's extremely credible because she's a seller of drugs and she's a gang member herself. So she's got to look after herself as well. So that's why the information is funneled out slowly, and the record shows that. So I understand what you're saying. However, she's the one who fully went to the police station and talked to them. She was not brought in. She was not made to identify anyone. She fully went in. If she was willing and did not feel a fear for her safety to go into the immigration and discuss the crime, why would she leave out Antonio? You're asking us to take this recantation as something that's really a significant piece of evidence when, in fact, the law says that recantations are distapored. They're not looked upon as credible. What are the reasons behind this? I will cite People v. Harper in 2013, where at a second stage it was dismissed, but the affidavit they had there was a recantation testimony as well, and it was a very weak case where that witness, the identification witness who now recanted, the court found that the defendant could not have gotten that witness to give an affidavit to him because he couldn't force the witness to recant, and then they found out from here that this was a weak case and it was not cumulative, and they found that the trial result would probably be different because it did lend credence to the defendant's claim all along that his confession was coerced, and there was very little additional evidence. I believe that's exactly like our case with Eunice. Now we can't give her testimony, but she was one of the linchpins of the safe case. Your Honor pointed out that Smith then recanted his testimony at trial. He recanted. I think he was sort of like, well, I don't remember exactly what he said, but I think we understand your points. Let's talk about the sentencing. Sure. Your Honor, we admit that in Meador, there is a sound that a defendant under the age of 18, it would be unconstitutional to apply this mandatory natural death sentence without considering mitigation, and we readily admit that our defendant was 19, so just turned 19 two months prior to this offense occurring, so he technically did not fall into that category. But we would argue that it shocks the moral conscience, the moral sense of our community to allow a 19-year-old to be sentenced to natural life purely because he was involved in this case where he was a lookout. We all know he wasn't the shooter. He was a lookout at best. He had very little criminal background, no violent criminal background, only 19, and it would seem just irrational and not constitutional for him to be sentenced to natural life without considering any mitigation. And you're talking about under the state constitution, aren't you? Because under the federal constitution, the Supreme Court has sort of given us a line of demarcation. Right. Are we bound under our constitution then to conclude that since he was over 18 that his sentence is constitutionally provisional? It would seem that that line has been drawn. We argue that that's an incorrect line to draw. We would argue that this issue would be with that again. We understand that it has been settled with Miller, and now Thompson is pending with the Supreme Court as well. Both of you point that out. What is the issue specifically in Thompson? Thompson, he was 19 as well, I believe it was 19. Has that been argued? No. With the Supreme Court? Sorry. Well, is the argument as applied? Is it multiple? Has anyone ever argued that the life sentence for an accountable offender should be the same or that it's constitutionally permissible to have a life sentence for the principal who actually pulled the trigger versus an accountable individual? Has anyone argued that in any of these cases? I apologize. I do not know that that has. Did you raise that argument? No, I did not. But your argument is applied in these facts. Does it matter that this case was first sentenced under the death penalty and the trial court was considering only whether or not there were sufficient mitigating factors to impose the death penalty and then went on to impose a natural life sentence? I don't understand your question. I'm sorry. Well, actually, when he was sentenced, the state was seeking the death penalty, and the court actually had to consider whether or not there were sufficient mitigating factors so as to preclude the imposition of death. When this sentencing hearing actually took place back whenever it was several years ago, the court was looking at this as a death penalty case, and that is the only other option that's mandatory life. Right. So that's the argument is that she was mandated to sentence him to natural life even though he did consider mitigating factors as far as the death penalty sentence would go. It had no bearing on whether or not he sentenced him to natural life because it was mandatory. And, Your Honor, I would love to file a supplemental brief discussing other cases that would support my defendant's claim that the accomplice instead of the principal  All right. Can we go back to the lawful moment? All right. So Miller was dealing with, I believe, a 14 or 16-year-old. Yes. Fortunately, yes. All right. Okay. And Ross was dealing with an individual that really didn't have that much time to reflect on what he was doing at the time. Right? Yes. All right. And he also was an armed, correct? Correct. All right. So isn't that factually distinguishable from this situation where we have a 19-year-old, right, actually over 19 years old at the time. All right. He is armed. All right. And he did have time to reflect on what he was doing. So his testimony is that he was not armed. Ulysses is the one who said he was armed, so now she retains him so she never saw him with a gun. So if we now believe her recantation, which I believe is second stage, we need to preview the truthfulness of the allegations and determine the credibility at that stage. So we don't know whether or not he had a gun. According to our science, he did not. So it would be similar, except for the fact that he's 19 and not 14. And what about the time period? It turns out in the court seems to stress that. In Miller, the defendant didn't have time to reflect on what he was doing, what actions he was taking, whereas here the record seems to indicate that there was a lot of time for the defendant to consider where he was actually participating. I would disagree on this. The defendant in this case went to the scene to actually deal drugs. When he arrived there, Ulysses told him that two people had been kidnapped to be violated. That's when he started to walk away, and then immediately, I believe it was Fred, came up and asked him, and OJ came up and asked him to drive, told him to drive them to the scene of the murder, which he did immediately, and then he dropped them off and left. So there was very little time in that for him to decide or to think about what he was doing. Does Miller also imply that life sentence for accountability is in some cases appropriate? I believe so, Your Honor. I apologize. In the Miller case, the 14-year-old, was he actually physically present for the murder? I'm sorry, Your Honor, I really assumed that this case would be up for deliberation. I believe it was, but I don't think he was harmed, and he was 14, and it was a matter of, it was a short period of time for deliberation. We have the record, and we have a person who was 19, just two months before he turned 19. But 18, 17 is the cutoff. You have to be 17, under 18, to get out. And as you said, too, I believe there are plenty of research that has been done that show that your mind is still not fully developed at even 19 years old. Well, yes. In fact, that's the thing. All these things that have been used don't have an 18-year-old demarcation line, do they? And in fact, for men, young men, apparently there's a distinction between the growth and development of the male mind versus that of a female mind. I mean, that's what the studies have shown, that the male mind isn't fully developed until the age of 25, whereas, anyway. All right. Well, I do really apologize about not preparing fully enough for the sentence submission. I would love the opportunity to be able to file a brief story analyzing the questions that you guys have presented to me. Well, we'll think about that. You have argued that, as applied, and actually you've argued multiple reasons why the sentence should be vacated. So, if we decide to allow that, we will, and you'd hear from us. Okay. I do believe you've developed this fully. That's why we've asked you to discuss it, and we consider it a very significant issue. In addition to your sentence, I would ask your honors to amend for an evidentiary summary in this case. I believe Antonio has made a substantial showing that his confession was coerced, and now that he's actually innocent based on the affidavit from Eunice, affidavit from Casey Dunbar, and the prior allegations of abuse against Cato. Thank you. Thank you, your honors. Good morning, your honors. Again, Michelle Grimaldi Stein. I'm an assistant state's attorney, and I represent the people of the state of Illinois. Your honors, initially, the defendant has asked this court to take as true Eunice Clark's recanting affidavit, this bald, perfunctory recantation, and she argues her case on behalf of the defendant as if we're starting from point zero again, and everything gets to be reweighed, and that is simply not the way this case is to be looked at at second stage. So, Eunice Clark's affidavit is nothing more than a fanciful recantation affidavit, and under People v. Coleman, the Supreme Court has required that all well-said facts at second stage be accepted as true unless they're affirmatively rebutted by the record. And this Coleman standard accords the proper deference to facts found at trial because it recognizes that under our system of justice, the trial is the place for the search for truth. It must be the primary form for the determination of guilt or innocence. And so, all of the facts, the evidence that come in, is filtered through a host of truth-seeking functions, discovery, investigation, confrontation through cross-examination, the presentation of conflicting evidence, observing the demeanor of the witnesses, and only after these facts are filtered through all those truth-seeking processes does the trial of a fact determine what the truth is. And so, Coleman recognizes that having survived the crucible of all these measures, the facts as found at trial have to have a presumption of reliability and truthfulness. And so, Coleman says you only have to take as true those well-said allegations that are not affirmatively rebutted by the record. Which Coleman are you referring to? D. George Coleman. Two Illinois Supreme Court cases. Is that the one that's justified Justice Tice or the other one? No, I said Christopher Coleman is Justice Tice. D. George Coleman from 1983, I believe. Is Justice Freeman, perhaps? I'm not sure, but in any event. I believe it is Justice Freeman. You're referring to the earlier one. All right. So, every single fact or allegation in Eunice Coleman's bare-bones prefrontal recantation affidavit is affirmatively rebutted by the record. Not only by her testimony, which was very, very detailed. Excuse me, but in the affidavit, does she ever even indicate that he wasn't a lookout? She simply says, her affidavit says nothing more than, I didn't see him there. Which said, I didn't see him kidnapped, or what was the other word? She doesn't say, I didn't see him there. She doesn't take him away from the scene. Correct. She uses two offenses and says, I didn't see him kidnapped, or something else. And that he didn't threaten her later. So, the concept that she didn't see him doesn't demonstrate that he wasn't there. And that is made abundantly clear by the Illinois Supreme Court opinion in Pico v. Walter Edwards. Now, in Walter Edwards, the issue was whether or not an affidavit of a co-defendant taking defendant Edwards out of the crime was sufficient to make the lower standard of a colorable claim of actual instance just necessary to get a successive petition filed. And that affidavit said that Edwards, quote, had nothing to do with the shooting and was, quote, neither a part of nor took part in this crime. And the Supreme Court said, where a defendant is convicted under an accountability theory, that affidavit, which did not say that the defendant wasn't there, wasn't even sufficient to make a colorable claim of actual instance. I never saw him kidnapped or conspire to kidnap, nor did she see him with a weapon. Correct. So the facts that this court are dealing with are the facts as found at trial. And it was not a weak case. Elizabeth Clark's affidavit also confirms, as this court recognized, with the defendant's own confession, because he admitted he was there. Now, as regards that... Let's talk about that for a minute. Is intimidation a fair game? I mean, should the police intimidate people into confession? In terms of a theoretical discussion with Your Honor, I would say that if it's permissible to give a defendant false evidence, intimidation itself is not necessarily the primary way that you would want it, but I don't think it's unlawful. As they can say, but there's no evidence that there was intimidation here. This newly discovered evidence that he claimed... The defendant has claimed that he was intimidated by Lloyd, he was intimidated by Cato, he was intimidated by lots of people who said they're going to take it out against his family. And that was fully mitigated. That was fully mitigated below, both in the pretrial motion to suppress and at trial, and all those allegations were rejected as not true. So that finding is res judicata now, unless the defendant can present newly discovered evidence, which allows this court to lower the bar of res judicata and to revisit the issue. That's procedurally how it's done, and the defendant has not provided any newly discovered evidence here to lower that bar. The defendant presented only the affidavit of Casey Dunbar, and he admits in his petition, the defendant admits, that he told his lawyer about Casey Dunbar. So it cannot possibly qualify as newly discovered evidence. It doesn't matter when that affidavit was dated. The requirement that in newly discovered evidence, that the defendant demonstrate, make an affirmative showing of due diligence, means that the defendant has to show what he's done to obtain this evidence, and that it wasn't available any time sooner than she got it. And that's not, he has made no such showing. What he has admitted is, I knew Casey from the neighborhood, I knew I was in the lineup with him, and I told my lawyer about it. So that affidavit cannot qualify as newly discovered evidence. It also can't qualify as newly discovered evidence, because, as Justice McBride pointed out, all Casey Dunbar says is the day before the defendant confessed. In the evening hours of October 27th, I was in the lineup, and the defendant also participated, and that lineup was viewed by Willie Lloyd. Well, I was trying to clear up these dates. It's apparent that one day was the lineup, and the next day was the statement. So I don't know how that suggests Willie Lloyd was there for 24 hours, or that he was there the next day, or when he was there. It doesn't suggest it, and it provides absolutely no support, and because it does not materially advance the defendant's claim, it does not qualify as newly discovered evidence. So let's talk about these OPS files. Was there a discussion in the trial court about what the court was looking at in terms of the review? I think the record demonstrates over and over and over that Judge Wattis, when he was examining these OPS files on remand, that he reviewed all 50, and there are... He said, well, he said, I was never told to go beyond Cato. I was told to review, read every single one of Cato's complaints, and look for a pattern. That's what I was basically instructed to do by the appellate court, not other detectives. That's his comments in this proceeding, but in the comments from the 05 case. In the record, Judge Cato says, as I'm going through these, I'm reading records that don't have anything to do with Detective Cato. That appears on page R3 of the supplemental record in 05-0994. On page R5, he says, I'm wasting a little time going through things that don't relate to Cato. He later says on page T3 that I've conducted a pretty thorough in-camera review of these files, of the OPS files. How are we supposed to review any of this if they're not in the record? There is no need to review any of this. I understand. We've already reviewed them once, but how are we supposed to review them again if we chose to when they're not in the record? And who do we hold that against? You or the defendant? Any ambiguity in the record has to be held against the appellant. The issue I suppose would be, Your Honor, is did Judge Juatis abuse his discretion in denying the defendant the opportunity to reopen review of the files, and he did not abuse his discretion. The defendant made no request to Judge Juatis that the 50 files be re-subpoenaed and attached as part of the record in order for this court to review the issue, so certainly that omission has to be held against the defendant. Well, aren't we talking about the same 50 files that the trial court had already previously reviewed? Correct. Well, it depends on what I believe. There are two different issues in this courtroom today. The first is whether or not the defendant should have been allowed to re-litigate his motion to suppress using the 50 files and allegedly presenting some newly discovered evidence. And then there's the issue of whether the judge abused his discretion in denying the discovery request for the defendant's attorney to be able to go through all of those files. Well, let me ask you this. Now, and I'm going to probably ask counsel. I'm going to vote. All right. Now, let's assume for purposes of argument that we've looked at the 32 complaints, because we have. We looked at every single one. I'm going to call Judge Cato myself. Chief Justice Cato. And in those files, we found no evidence of promises or bringing in witnesses or lying to a defendant. We found one case where the complainant said, and it was an eyewitness who said that she was forced to make an identification as a liar. Now, those were all of Cato's. Now, we've already concluded that those are out of the way. I don't think there's an argument that we should relook at those 32. Now, let's go to the 18 that were here before but aren't here now. Those files absolutely, unequivocally do not name Cato. How can we conclude that there was a pattern which Detective Cato and the others used? Let's throw them all into a big pot. How can we conclude from those 18 that absolutely do not include him, how can we then find a pattern that Cato and those other detectives were doing this? And that's a pattern if Cato is noticeably absent from it. What the defendant is doing here, this court is correct, it can't determine a pattern. But what the defendant is doing here is kind of like throwing everything they can against the wall and hoping something sticks. But I'm just asking, if he's not in those other 18, which we know he isn't, how can we say that there was a pattern that Cato and the other detectives involved themselves in making promises when he's not involved? How do we make that clear? I don't think that establishes a pattern. I'm sorry. But he's not in those, so how does that establish a pattern? Your answer doesn't. No, the answer is also that he's hoping that there might be, in fact, in defendant's brief he says that there's probably evidence of misconduct by one of the other detectives in those 18 files. And that's simply utter speculation. Well, that's not the question. The question is, is there a pattern of Cato, Perez, Cronin, and was there one other person? Chambers, Detective Chambers. Yes. So if it's a pattern of these four, how do we find the pattern from the 18 when we know he's not in that group? My guess is that the defendant would hope that if there's evidence of misconduct by another detective, which, by the way, the Post-Conviction Counsel was unable to provide even a single case citation against Detective Chambers, Detective Perez, or Officer Perez-Mesha. Doesn't the Supreme Court in a couple of cases say that it has to be against the officer? Correct, but the defendant doesn't. And if you say the group, how do you have a group when one of the group is not there? You can't have a group. I think that even the defendant would concede that the primary thrust is that it was Detective Cato. Yes, but let's assume that it's more than that. It's Cato and a group. How do we get to Cato and a group when we know that Cato's not in the group? You don't get to Cato and a group when Cato is not in the group. And the best case scenario for the defendant was an effort to prove somebody else might have done it and that person, along with Cato, then did it. But the truth is that you had nothing. All right. So, essentially, the defendant alleges Perez struck him in the head and that Cato, through reward, intimidated him and threatened him. All right. But specifically, what would the other officers allegedly have done to the defendant? Nothing. Detective Chambers, Detective Perez. We're just providing an opportunity to go fishing. Absolutely. Nothing but a fishing expedition, and it's a fishing expedition that isn't supported by anything in the record. Post-conviction counsel in this case spent months researching this, well over a year, researching and designing these claims, and she was unable to come up with anything, naming the other detectives. And the arguments that she now says, the cases which the defendant now argues, are newly discovered evidence that corroborate the claims of coercion, simply don't corroborate those claims. She cites three. First, the single OPS file, which, as this court has recognized, didn't involve any claims of police coercion, similar to what the defendant has. He cites the Ezekiel McDaniel case, and he cites the Andre Wallace case. Now, both of those cases were from the timeframe of the OPS files, which this court looked at. And Judge Waters specifically said, when he granted the motion to dismiss this case, that the defendant had not presented, and I'm quoting, any new evidence of any type of police misconduct. That statement clearly indicates that the Ezekiel McDaniel complaint and the Andre Wallace complaint were also among those OPS files, which the circuit court and this court have already reviewed. So therefore, they can't possibly qualify as newly discovered evidence. They were also, as counsel pointed out, the Wallace decision was released in 1998, and the McDaniel decision in 2001. The defendant filed his Pro Se, his second Pro Se petition, on March 13, 2002. So they can't qualify as newly discovered because the defendant could have found them in time for that petition. So he simply has not sustained his burden of demonstrating newly discovered evidence, and he hasn't demonstrated his burden of showing that these cases are sufficiently similar under the Patterson criteria where they would even be admissible. As Justice McBride pointed out, Ezekiel McDaniel involved a claim of physical coercion, and that wasn't even the reason why his confession was suppressed. His confession was suppressed based on his age, his lack of experience, the fact that he was arrested in the middle of the night and held, and not allowed to speak to a concerned adult. Well, you know, perhaps though the physical coercion, which, you know, we don't know if it's still going on. We certainly know from everything that it has gone on. So perhaps the new frontier is psychological coercion, false promises, bringing in gang members. If there's a sufficient pattern, then I think that, you know, that would certainly perhaps warrant a second look. But as I said, we've already reviewed these, but I don't know how we're supposed to review them again when they're not here. Now I think it's time for you to discuss the Thompson case and this case and the arguments regarding why we shouldn't remand this for a new sentencing hearing for the court to consider factors in mitigation, which it can't consider really, even if it says it's considering them. How could it possibly consider them when the mandatory obligation of the trial court is to sentence this person to natural life in prison? Your Honor, what the defendant wants this court to do is to move back the line set by the United States Supreme Court as to what ages are inappropriate for mandatory natural life. And we're not going to write that with them, are we? We don't have to say that, do we? You don't have to, but the United States Supreme Court considered the very studies that the defendant cites, and it drew the line at under 18. But I've heard studies say that the development of the brain is not complete, even at age 20 or 22. Isn't that what they all say? I believe that they say that, yes, that there continues to be. But that would require a presumption that no 19-year-old or 21-year-old or 23-year-old, however the defendant pointed out in their decision that, yes, there will be some that are actually more mature than others, and there will be those that aren't as mature as others. So there's this contrast between each individual, and there's no room for that under our statutes, is there? The statute requires mandatory natural life, and it is not in violation of any constitutional principles. Well, what about the idea that if you pull the trigger, you're going to get mandatory life, and if you don't pull the trigger, but you're there and you help a little, you're getting mandatory life? Is there a problem with that? You said there's no constitutional problem at all with the statute, but I mean, I know that's really not the issue before us. It hasn't really been argued. But what about the Thompson case? Was the defendant accountable, or was he an actual shooter? Your Honor, this case was just argued in the Supreme Court on September 16th, and I was present for the argument, but I honestly do not recall the facts of that case. Let's say we have a 19-year-old. We have a 19-year-old, and we have a 19-year-old who was an actual shooter. What if it was the year before, and he was 18 years old plus two months? The line has to be drawn somewhere. I know. This is where the United States Supreme Court has said it comports with our constitutional requirements, and it doesn't shock the moral sense of anything. When you have a 19-year-old is going to get the same sentence as the big heavy, the gang leader, that doesn't shock the conscience that the guy who ordered it all is going to get life, and then the kid who's under his thumb is going to get life too, and really their actions are not the same. Forget all the other things. What about that? Doesn't that shock the conscience that the law requires that the guy that pulls the trigger gets the max, and the kid that doesn't pull the trigger gets the max? Where is the—that's shocking. No one said then that that is a law of accountability, that when you earned an assessment of the law of accountability, that you will be found guilty of the murder, but that doesn't comport with the goals of sentencing, does it? The legislature is entitled to set mandatory terms. It's an appropriate exercise of the legislative authority. Aren't the courts struggling across this country with these mandatory sentences that actually give no concern to sentencing factors at all? Isn't that shocking to the conscience that we no longer consider any— that the court in this case could not—he could consider mitigating factors in choosing to decide whether to impose death penalty in this case, which the Supreme Court subsequently said you can't give to a juvenile, although he wasn't. But the court in this case did consider whether or not to impose death penalty, but then for purposes of sentencing, natural life, he had no factors to consider at all. There's no consideration of anything. Because society has decided and the legislature has determined that when you take two lives, a 15-year-old and an 18-year-old, you have forfeited your right to live among a civilized society. And that is not— It's shocking that that same civilized society doesn't think that the courts should consider any factors when they impose the sentence, and when the court says, if you pull the trigger, you have to get life. If you participated with less than that, you still get life. You don't think that someone could be shocked by that notion. In a theoretical context, perhaps facts could be drawn, but in the context of this case where this defendant came down and surrounded these two young boys, he was armed with a gun. He helped get them into the car, force them into the car, knowing what was going to happen to them. He then followed— I understand his accountability. I understand the conduct. We could take it and accept everything that you're saying in terms of, you know, he was there, he helped get them in the car, he was armed with a firearm, then they were taken away, and then they were subsequently executed. It's a horrific set of facts. But the question here is, what about the sentencing scheme that our Constitution provides, that there are to be factors considered by the courts on either side, and under this statutory scheme, the fact that this kid was 19 years old in two months doesn't mean a thing. The fact that his mother died a few months before this incident doesn't mean a thing. The fact that actually his mother, maybe it was his mother's mother that cared for him, but the fact of the matter is that his main caregiver died within the year of this. The record shows he never had a father in his life, ever. The record shows that he didn't complete high school. And so you take a child that has all these other benefits, that has two parents, that graduates from high school, that goes on to college, that doesn't have the, well, doesn't have the same pressure of having, you know, this whole gang situation surrounding him every day of his life, and that's not shocking to the conscience that the courts may not consider any of that, but simply impose life in prison for a 19-year-old. And a line of demarcation doesn't shock the conscience, or it's adequate. Not a single court in the United States has moved that line. No, that's right, they have. But right now the Illinois Supreme Court is actually considering whether to move that line. And in the Miller case, when the judge was faced with a mandatory life, he sentenced that 14-year-old to 50 years instead of life. But he wasn't really permitted to do that under this statute that was in place at the time, was he? No, Your Honor, he wasn't. But the judge that sentenced this defendant did not feel the same compulsion, having reviewed, having seen the defendant, having heard the testimony. Back when he considered this, he had two options, either to sentence him to death or sufficient mitigating factors to preclude that, and then he goes on to consider what? There weren't any considerations. It was absolute, mandatory life, no matter what his age, no matter what his background, no matter. So I think an argument can be made that that kind of sentencing scheme, in which a 19-year-old, it shocks the conscience. The argument has been made. I guess it's your position that you could have bright-line rules for sentencing, correct? That there's nothing unconstitutional about a bright-line rule, and that there's nothing unconstitutional when an individual actively participates in the murder of two or more individuals to mandate natural life. And when someone is a lookout, they participate in the murder. Your Honor, he drove the two. This is, in his own statement, what did he admit as far as being involved in the actual shooting? Not the kidnapping. Because we know he couldn't get life if he were simply found guilty of two kidnappings. Are we sentencing based on his statement? No. Let's go over his own statement, not his testimony in trial. What did he admit to the Assistant State's Attorney and the police officers as far as his actual culpability regarding the shooting that took place in some weeds where he was present? That he was told there was going to be a violation, and that he was to drive Fred and one other gang member to that area for the violation. Did he know what the violation was going to be? He knew that the violation could be anything from a beating to murder. He knew that. Okay. And that he didn't say, I'm sorry, I can't do that. He didn't say... Right. We know that. He didn't. So he never puts himself where the armed people are actually firing all the bullets into these two men. No, he doesn't. He conveniently makes himself only the lookout. Well, isn't it true, though, that the evidence shows that there were people that were in the cars with the hoods up, and that there were others that were actually executing those young men? Yes. Because there were people that were really not at the actual shooting. They were helping out with the cars. They were doing the old lookout routine. And the lookout has always been held under Illinois law as accountable as the person who actually fired the trigger. We're not discussing the accountability law. We're talking about sentencing. That's the issue here. It's not accountable. We know he's accountable. We know that. And I don't think the same interests are at play, and I think the Constitution has a couple of provisions about sentencing that we're bound by, and this is not about whether he was accountable. We know he was accountable. But the law has always provided that the person who is accountable is to be sentenced. There isn't a separate sentencing scheme for accountable offenders. No, I agree with you. But one thing that we did have in the past was the court's ability to fashion a sentence based upon all of the facts. And even if you – so before they had the mandatory life for when you were found guilty of murder, there was actually some consideration given to mitigating factors. This really doesn't have that at all. There is no consideration. You're right. That is correct. Forgetting about accountability, there's no consideration of age, usefulness, family history, background, education, employment. It's all gone. And you're saying that that's constitutional, and I think your argument is certainly one that you should make. Thank you. Your Honor, if there are no other questions, for these reasons and all those stated in the people's brief, we respectfully request this court to affirm the Circuit Court's second stage dismissal of the defendant's petition. Just a couple of points, Your Honors. I do want to ask you that one question. Sure. I was just going to – were you going to address it? I'm sorry to interrupt you. About the 18th complaint. Correct. We know he's not in those. We know he was in the 30th. We know that there's no – other than the one that we mentioned in our previous Rule 23, there's no suggestion in any of those about threats or promises or false promises or what have you. So then we go to the 18th where we know he's not there. So how does your argument apply when you can't have a group of the four, let's say, doing something that is, you know, psychologically coercive when he's not in those? So I don't believe that we need to show that there is a group, that the pattern is a group of officers. I think we can show individually even that those officers do have a pattern of coercion, of concession, but that would be enough to show a pattern. I don't think it has to be them a group at all times. They were all in Area 4. And what specifically did these officers do? I mean, that's the question. You want files to be reviewed, but yet you haven't asserted what specifically these other officers did. Make an allegation as to Detective Cato. Make an allegation as to Detective Perez. But what about their officers? What exactly did they do? In his motion to suppress, he asserted that Officer Perez, Croton, and Chambers were in the room together when Cato was threatening him. I believe that in itself should show that they were complicit in this kind of coercion. It was actually Detective Cronin who brought in Willie Wood to threaten him. But didn't he contradict that testimony when they were on a trial? That Cronin brought in Willie Wood? I don't believe so, Your Honor. From day one, he claimed that all officers were involved in the coercion tactics and that Cronin brought in Willie Wood to threaten him. The counsel's infection is to not bring up the affidavit from Casey Dunbar to show that he was at least present at the police station. The 18 files, as Your Honor points out, they weren't reviewed for the other three officers, and we don't know what they contained. So it's speculation now to determine whether or not there are other allegations that would support defendant's allegations. That's why we believe there should be an evidentiary hearing, and before that would happen, there should be a review of those 18 files. The Supreme Court's mandate did direct the circuit court to review the files requested by the defendant. The files requested by defendant at the motion to suppress the whole case have been filed against those four officers that he claims coerced his confession. And you do know the standard of review is abuse of discretion, and we've already reviewed this once before. And we don't have them now. But not to that 18 file. Not to that 18 file. There's no way I would review that. You are arguing there's a pattern. Sure, but I don't argue about there being no pattern when we don't have him involved in the pattern. Each individual detective can have a pattern, and in this case it just happens that they're all together. I don't believe that we need to show a pattern where each of these detectives are involved in each case. Individually, I believe that would be enough. I'm sure you should not be blamed for the files not being reviewed. You should be blamed for not providing the record on appeal. We have attempted everything possible to try to achieve them. We've been trying to do our best. Where are they? What is your knowledge of where they are? We believe they're at the circuit court. After your armies reviewed them, the record was sent back to the circuit court, and we have not been able to look at them since. We have talked to the clerk at Waterloo's Chamber. They cannot find them. Antonio Franco did file a motion to seal, and Waterloo expressed wonder, and the record was supposed to be supplemented with those files, but they're not here. There's nothing further we could do. What about the subpoena that's missing, too? The subpoena? Wasn't there a second subpoena, supposedly issued, that's not in the record either? The PC Council attached that. It's back. Unless I'm mistaken, the PC Council... Is that the first subpoena or the second subpoena? For the discovery? Yes. For the offense record? Yes. It was run by trial level, and then run by the PC Council when they first got the case. And is that in the record? Yes. All right. The other thing, the state turns out that we allegedly did not cite any other cases that involved misconduct by the other officers who were involved. There is a case, people be daring, which is cited in my brief on page 26, where the defendant alleges that detective Chambers falsely threatened him, threatened safety, threatened to claim rape if he didn't confess, and threatened to take away his children. So there is at least one other case, and there could be others in those OPS files that were never reviewed after those other three officers. Those files that are missing that you say you cannot find, you don't have copies of those? We do not, Your Honor. They were under seal. They were always using a camera. We wouldn't have a record of them. We were never able to look at them. Okay. Lastly, we do, I do agree with Your Honor McBride, that it does shock the moral conscience to sometimes a defendant like this, in this case, where he was the accomplice, and his testimony was that he only dropped off the higher ups because he was made to, and then he immediately left. He wasn't at the scene of the shooting, and he also argued that he was not the lookout. If there's no further questions, Your Honor. No. I want to thank you both for your arguments in the briefs. We appreciate the comments by the attorneys. The case was well argued. It's well briefed, and we will take the matter under advice. Thank you both. Court stands adjourned.